## KRAMER *v.* CARIBBEAN MILLS, INC.

No. 156. Argued January 23, 1969.—Decided May 5, 1969.

*Eugene Gressman* argued the cause for petitioner. With him on the briefs was *Jack Banner.*

*Dennis G. Lyons* argued the cause for respondent. With him on the brief was *Morris Harrell.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

The sole question presented by this case is whether the Federal District Court in which it was brought had

824

jurisdiction over the cause, or whether that court was deprived of jurisdiction by 28 U. S. C. § 1359. That section provides:

> "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

The facts were these. Respondent Caribbean Mills, Inc. (Caribbean) is a Haitian corporation. In May 1959 it entered into a contract with an individual named Kelly and the Panama and Venezuela Finance Company (Panama), a Panamanian corporation. The agreement provided that Caribbean would purchase from Panama 125 shares of corporate stock, in return for payment of $85,000 down and an additional $165,000 in 12 annual installments.

No installment payments ever were made, despite requests for payment by Panama. In 1964, Panama assigned its entire interest in the 1959 contract to petitioner Kramer, an attorney in Wichita Falls, Texas. The stated consideration was $1. By a separate agreement dated the same day, Kramer promised to pay back to Panama 95% of any net recovery on the assigned cause of action,[1] "solely as a Bonus."

Kramer soon thereafter brought suit against Caribbean for $165,000 in the United States District Court for the Northern District of Texas, alleging diversity of citizenship between himself and Caribbean.[2] The District

---

[1] That is, Kramer would receive 5%, and Panama 95%, of the net proceeds remaining after payment of attorneys' fees and expenses of litigation.

[2] Title 28 U. S. C. § 1332 (a) (2) grants district courts original jurisdiction of civil actions in which the matter in controversy exceeds $10,000 and is between "citizens of a State, and foreign states or citizens or subjects thereof . . . ." The District Court would have had no jurisdiction of a suit brought by Panama against Caribbean, since both were alien corporations.

Court denied Caribbean's motion to dismiss for want of jurisdiction. The case proceeded to trial, and a jury returned a $165,000 verdict in favor of Kramer.

On appeal, the Court of Appeals for the Fifth Circuit reversed, holding that the assignment was "improperly or collusively made" within the meaning of 28 U. S. C. § 1359, and that in consequence the District Court lacked jurisdiction. We granted certiorari, 393 U. S. 819 (1968). For reasons which follow, we affirm the judgment of the Court of Appeals.

I.

The issue before us is whether Kramer was "improperly or collusively made" a party "to invoke the jurisdiction" of the District Court, within the meaning of 28 U. S. C. § 1359. We look first to the legislative background.

Section 1359 has existed in its present form only since the 1948 revision of the Judicial Code. Prior to that time, the use of devices to create diversity was regulated by two federal statutes. The first, known as the "assignee clause," provided that, with certain exceptions not here relevant:

> "No district court shall have cognizance of any suit . . . to recover upon any promissory note or other chose in action in favor of any assignee, . . . unless such suit might have been prosecuted in such court . . . if no assignment had been made." [3]

The second pre-1948 statute, 28 U. S. C. § 80 (1940 ed.),[4] stated that a district court should dismiss an action whenever:

> "it shall appear to the satisfaction of the . . . court . . . that such suit does not really and sub-

---

[3] 28 U. S. C. § 41 (1) (1940 ed.). The clause first appeared as § 11 of the Judiciary Act of 1789, 1 Stat. 79.

[4] This statute was first enacted in 1875. See 18 Stat. 470.

"stantially involve a dispute or controversy properly within the jurisdiction of [the] court, or that the parties to said suit have been improperly or collusively made or joined . . . for the purpose of creating [federal jurisdiction]."

As part of the 1948 revision, § 80 was amended to produce the present § 1359. The assignee clause was simultaneously repealed. The Reviser's Note describes the amended assignee clause as a " 'jumble of legislative jargon,' " [5] and states that "[t]he revised section changes this clause by confining its application to cases wherein the assignment is improperly or collusively made . . . . Furthermore, . . . the original purpose of [the assignee] clause is better served by substantially following section 80." That purpose was said to be "to prevent the manufacture of Federal jurisdiction by the device of assignment." *Ibid.*

## II.

Only a small number of cases decided under § 1359 have involved diversity jurisdiction based on assignments,[6] and this Court has not considered the matter since the 1948 revision. Because the approach of the former assignee clause was to forbid the grounding of jurisdiction upon *any* assignment, regardless of its circumstances or purpose,[7] decisions under that clause are of little assistance. However, decisions of this Court under the other predecessor statute, 28 U. S. C. § 80 (1940 ed.), seem squarely in point. These decisions, together with the

---

[5] The quotation is from a Comment, Chaos of Jurisdiction in the Federal District Courts, 35 Ill. L. Rev. 566, 569 (1941); it refers primarily to the obscure wording of certain exceptions contained in the clause. See *id.*, at 569–571.

[6] See cases cited in 3A J. Moore, Federal Practice ¶17.05[3.–1], nn. 7–9 (2d ed. 1968).

[7] There were exceptions for particular types of assignments, none of which is relevant here.

evident purpose of § 1359, lead us to conclude that the Court of Appeals was correct in finding that the assignment in question was "improperly or collusively made."

The most compelling precedent is *Farmington* v. *Pillsbury,* 114 U. S. 138 (1885). There Maine holders of bonds issued by a Maine village desired to test the bonds' validity in the federal courts. In an effort to accomplish this, they cut the coupons from their bonds and transferred them to a citizen of Massachusetts, who gave in return a non-negotiable two-year note for $500 and a promise to pay back 50% of the net amount recovered above $500. The jurisdictional question was certified to this Court, which held that there was no federal jurisdiction because the plaintiff had been "improperly or collusively" made a party within the meaning of the predecessor statute to 28 U. S. C. § 80 (1940 ed.). The Court pointed out that the plaintiff could easily have been released from his non-negotiable note, and found that apart from the hoped-for creation of federal jurisdiction the only real consequence of the transfer was to enable the Massachusetts plaintiff to "retain one-half of what he collects for the use of his name and his trouble in collecting." 114 U. S., at 146. The Court concluded that "the transfer of the coupons was 'a mere contrivance, a pretence, the result of a collusive arrangement to create'" federal jurisdiction. *Ibid.*

We find the case before us indistinguishable from *Farmington* and other decisions of like tenor.[8] When the assignment to Kramer is considered together with his total lack of previous connection with the matter and his simultaneous reassignment of a 95% interest back to Panama, there can be little doubt that the assignment was for purposes of collection, with Kramer to retain 5% of the net proceeds "for the use of his name

---

[8] See, *e. g., Williams* v. *Nottawa,* 104 U. S. 209 (1881); *Little* v. *Giles,* 118 U. S. 596 (1886).

and his trouble in collecting."[9]  If the suit had been unsuccessful, Kramer would have been out only $1, plus costs.  Moreover, Kramer candidly admits that the "assignment was in substantial part motivated by a desire by [Panama's] counsel to make diversity jurisdiction available . . . ."[10]

The conclusion that this assignment was "improperly or collusively made" within the meaning of § 1359 is supported not only by precedent but also by consideration of the statute's purpose.  If federal jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort liti-

---

[9] Hence, we have no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not "improperly or collusively made," regardless of the transferor's motive.  See, *e. g., Cross* v. *Allen,* 141 U. S. 528 (1891); *South Dakota* v. *North Carolina,* 192 U. S. 286 (1904); *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.,* 276 U. S. 518 (1928); cf. *Williamson* v. *Osenton,* 232 U. S. 619 (1914).

Nor is it necessary to consider whether, in cases in which suit is required to be brought by an administrator or guardian, a motive to create diversity jurisdiction renders the appointment of an out-of-state representative "improper" or "collusive."  See, *e. g., McSparran* v. *Weist,* 402 F. 2d 867 (1968); *Lang* v. *Elm City Constr. Co.,* 324 F. 2d 235 (1963); *County of Todd* v. *Loegering,* 297 F. 2d 470 (1961); cf. *Mecom* v. *Fitzsimmons Drilling Co.,* 284 U. S. 183 (1931).  Cases involving representatives vary in several respects from those in which jurisdiction is based on assignments: (1) in the former situation, some representative must be appointed before suit can be brought, while in the latter the assignor normally is himself capable of suing in state court; (2) under state law, different kinds of guardians and administrators may possess discrete sorts of powers; and (3) all such representatives owe their appointment to the decree of a state court, rather than solely to an action of the parties.  It is not necessary to decide whether these distinctions amount to a difference for purposes of § 1359.

[10] Brief for Petitioner 16.

gation could be channeled into the federal courts at the will of one of the parties. Such "manufacture of Federal jurisdiction" was the very thing which Congress intended to prevent when it enacted § 1359 and its predecessors.

## III.

Kramer nevertheless argues that the assignment to him was not "improperly or collusively made" within the meaning of § 1359, for two main reasons. First, he suggests that the undisputed legality of the assignment under Texas law necessarily rendered it valid for purposes of federal jurisdiction. We cannot accept this contention. The existence of federal jurisdiction is a matter of federal, not state, law. See, *e. g., Missouri P. R. Co.* v. *Fitzgerald,* 160 U. S. 556, 582 (1896). Under the predecessor section, 28 U. S. C. § 80 (1940 ed.), this Court several times held that an assignment could be "improperly or collusively made" even though binding under state law,[11] and nothing in the language or legislative history of § 1359 suggests that a different result should be reached under that statute. Moreover, to accept this argument would render § 1359 largely incapable of accomplishing its purpose; this very case demonstrates the ease with which a party may "manufacture" federal jurisdiction by an assignment which meets the requirements of state law.

Second, Kramer urges that this case is significantly distinguishable from earlier decisions because it involves diversity jurisdiction under 28 U. S. C. § 1332 (a)(2), arising from the alienage of one of the parties, rather than the more common diversity jurisdiction based upon the parties' residence in different States. We can perceive no substance in this argument: by its terms, § 1359

[11] See, *e. g., Little* v. *Giles,* 118 U. S. 596, 602 (1886); *Lehigh Mining & Mfg. Co.* v. *Kelly,* 160 U. S. 327, 336 (1895); cf. *Smith* v. *Kernochen,* 7 How. 198, 215–216 (1849).

applies equally to both types of diversity jurisdiction, and there is no indication that Congress intended them to be treated differently.

## IV.

In short, we find that this assignment falls not only within the scope of § 1359 but within its very core. It follows that the District Court lacked jurisdiction to hear this action, and that petitioner must seek his remedy in the state courts.[12] The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

---

[12] Petitioner asks that we make our ruling prospective only, asserting that he reasonably believed he had a right to invoke federal jurisdiction, and that the four-year Texas statute of limitations governing contract actions, Tex. Rev. Civ. Stat., Art. 5527 (1948), may bar him from recovering in the state courts as to some of the installments allegedly due him. However, another Texas statute, Tex. Rev. Civ. Stat., Art. 5539a (1948), provides:

"When . . . a judgment . . . shall be set aside or annulled in a direct proceeding, because of a want of jurisdiction of the Trial Court . . . and within sixty (60) days after such dismissal . . . becomes final, such action shall be commenced in a Court of Proper Jurisdiction, the period between the date of first filing and that of commencement in the second Court shall not be counted as a part of the period of limitation unless the opposite party shall . . . show the first filing to have been in intentional disregard of jurisdiction."

This statute has been held to apply when the dismissal on jurisdictional grounds was by a federal court. See, *e. g., Burford* v. *Sun Oil Co.,* 186 S. W. 2d 306 (Ct. Civ. App. Tex. 1944). Petitioner alleges that the first contract installment accrued on July 1, 1962. Hence, Art. 5539a appears to assure him a full state-court remedy, and thus obviates the need for further discussion of prospectivity.